# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| YOSHIDA LORETTA THOMAS, | |
| Plaintiff, | No. 17-CV-2052-KEM |
| vs. | **ORDER** |
| GRAY TRANSPORTATION, INC., | |
| Defendant. | |

Plaintiff Yoshida Loretta Thomas, an African-American woman, brought suit against her former employer, Gray Transportation, Inc. (Gray Transportation), alleging race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964. Doc. 2. Currently before the court is Defendant Gray Transportation's motion for summary judgment. Doc. 15. Thomas filed a resistance (Docs. 16, 19), and Gray Transportation filed a reply (Doc. 21). After a hearing on the motion (Doc. 23), the parties filed supplemental briefing (Docs. 24, 25). I find that Gray Transportation is entitled to summary judgment on all of Thomas's claims and thus **grant the motion** (Doc. 15).

## I. BACKGROUND

The following facts are recited in the light most favorable to Thomas, the nonmoving party. Gray Transportation is a trucking company that employs (among others) truck drivers, dispatchers who communicate with the drivers, and brokers that arrange for customers' loads to be transported by truck. LeRoy Gray is the chief executive officer of Gray Transportation, and his son, Darrin Gray, is the president (to

avoid confusion, I refer to the Grays by their first names). Pl. SOF ¶¶ 1-2; Def. Resp. SOF ¶¶ 1-2.[1]

LeRoy hired Thomas to work as a dispatcher after an in-person interview on October 19, 2015, and Thomas met Darrin that same day. Def. SOF ¶¶ 2-4; Pl. Resp. SOF ¶¶ 2-4. LeRoy offered to pay Thomas $600 per week ($31,200 annually), which Thomas accepted without requesting additional pay (this salary represented a 50¢ per hour increase as compared to what Thomas had been earning). Def. SOF ¶ 5; Pl. Resp. SOF ¶ 5;[2] Pl. SOF ¶¶ 4, 17; Def. Resp. SOF ¶¶ 4, 17; Pl. App. 29, 31; Def. App. 17. Thomas began working for Gray Transportation two weeks later, on November 2, 2015. Def. SOF ¶ 4; Pl. Resp. SOF ¶¶ 4. She primarily worked as a dispatcher, but she also performed brokerage work from January to June 2016. Pl. SOF ¶¶ 22-25, 35-37, 40; Def. Resp. SOF ¶¶ 22-25, 35-37, 40. She stopped working as a broker after Sel Saric, the other dispatcher who also worked as a broker, received a $408 bonus, while she did not. Pl. SOF ¶¶ 25- 40; Def. Resp. SOF ¶¶ 25-40; Pl. App. 62-63. Saric is a white man of Bosnian descent.

---

[1] "Def. SOF" refers to Defendant Gray Transportation's Statement of Facts filed at Doc. 15-1. "Pl. Resp. SOF" refers to Plaintiff Thomas's Response to Defendant Gray Transportation's Statement of Facts filed at Doc. 16. "Pl. SOF" refers to Plaintiff Thomas's Statement of Facts filed at Doc. 19-1, and "Def. Resp. SOF" refers to Defendant Gray Transportation's Response to Plaintiff Thomas's Statement of Facts filed at Doc. 21-1. "Def. App." refers to Defendant Gray Transportation's appendix filed at Doc. 15-3, "Pl. App." refers to Plaintiff Thomas's appendix filed at Doc. 19-2, "Def. Supp. App." refers to Defendant Gray Transportation's supplemental appendix filed at Doc. 21-2, "Def. Second Supp. App." refers to Defendant Gray Transportation's second supplemental appendix filed at Doc. 24-1, and "Pl. Supp. App." refers to Plaintiff Thomas's supplemental appendix filed at Doc. 25-1.

[2] Thomas asserts in the statement of facts that she was offered $660 per week but cites to no portion of the record in support (and in different paragraphs of her statement of facts, Thomas asserts that $600 per week was the offer and that she made $31,200 as a dispatcher). Pl. Resp. SOF ¶ 5; Pl. SOF ¶¶ 4, 17. Thomas also testified at her deposition that she was offered $600 per week. Def. App. 17.

Gray Transportation's unwritten brokerage bonus policy was that when the brokerage profit was more than $10,000 for a month, brokers were paid a bonus based on the amount of profit that was over $10,000—with one broker, the bonus was 5% of the amount of profit greater than $10,000; and with two brokers, the bonus was 2.5% each of the amount of profit greater than $10,000. Pl. SOF ¶¶ 32-33; Def. Resp. SOF ¶¶ 32-33. Rather than determining the bonus based on how much work each broker did, the 5% bonus was split evenly between brokers because of the time and effort to determine loads and revenues for each broker. Pl. SOF ¶ 34; Def. Resp. SOF ¶ 34. After the main person who performed brokerage work for Gray Transportation left in January 2016, Gray Transportation no longer had a "primary broker." Pl. SOF ¶¶ 24-25; Def. Resp SOF ¶¶ 24-25. LeRoy told Saric and Thomas "that [they] were going to take over the brokerage side of the business," in addition to performing their dispatching duties. Pl. App. 45. Saric had previously been trained to perform brokerage work as a substitute when the main person was on vacation or otherwise out of the office; he had begun brokering in February 2015 and received his first brokerage bonus in June 2015. Pl. App. 22-23. Thomas had experience as a broker from her previous employment. Pl. App. 42. When Thomas learned that Saric had received a bonus in June 2016[3] and she had not, Thomas asked LeRoy about it. Pl. App. 47. LeRoy said that "it was his company and he can do what he wants and if [Thomas didn't] like it, [she] could quit." Pl. App. 47. Thomas stopped performing brokerage work after that. Gray Transportation contends that Thomas did not receive a bonus because "she did not generate enough revenue to offset a bonus package" and that although Thomas brokered a few loads or otherwise helped Saric, "the majority of [the brokerage work] was . . . Saric." Pl. App. 18, 21-22.

---

[3] It is not clear whether Saric's bonus was 2.5% or 5% of the excess profit, but LeRoy testified that "it was probably 5 percent." Pl. App. 11.

On Friday, December 23, 2016, Thomas was twenty to thirty minutes late to work (she had previously received a written warning after being late in July 2016 "that further tardiness can and will result in her termination"). Def. SOF ¶¶ 8-10; Pl. Resp. SOF ¶¶ 8-10. Darrin believed that Thomas was hungover or otherwise disheveled and not "in a frame of mind to . . . work," so he sent her home for the day, making no mention of her tardiness. Pl. SOF ¶ 45; Def. Resp. SOF ¶ 45; Pl. App. 33; Def. Supp. App. 78-79. Feeling wrongly accused, Thomas went to a clinic to obtain a blood test, and she returned to work a few hours later to show Darrin the results indicating that there was no alcohol in her bloodstream. Pl. App. 35; Def. Supp. App. 80. At that point, Darrin conveyed to Thomas that her employment with Gray Transportation was terminated, and he instructed her to leave and to come back at a later date for her things. Pl. App. 35-36. Thomas applied for unemployment benefits that day. Pl. SOF ¶ 51; Def. Resp. SOF ¶ 51; Pl. App. 26, 66. On Monday, December 26, 2016, she applied for a few jobs. Def. SOF ¶ 11; Pl. Resp. SOF ¶ 11.

Due to the holiday, even if Thomas had not been fired, she would not have returned to work until Tuesday, December 27, 2016. Def. Supp. App. 80. At some point during the holiday weekend, Thomas received a text message from someone at Gray Transportation stating that "if [Thomas] want[ed] to come in Tuesday morning and discuss [her] employment, [she could]." Def. App. 21. Thomas went to the meeting on the 27th and returned to work the next day, on Wednesday, December 28, 2016. Def. SOF ¶ 12; Pl. Resp. SOF ¶ 12; Def. App. 22.

Thomas's employment with Gray Transportation did not last much longer. On January 17, 2017, a flurry of emails were exchanged between Thomas, Darrin, and LeRoy after Thomas notified them that she had begun applying for other employment after being fired. Def. SOF ¶¶ 13-20; Pl. Resp. ¶¶ 13-20; Def. App. 47-53. Darrin asked when Thomas planned on leaving, because she was supposed to begin a week-long training session on a new software system the following Monday, January 23. Def. App.

4

48. Thomas responded that she was "putting in applications now" and had not "interviewed for anything yet." Def. App. 49. Darrin indicated that since Thomas was looking for other employment, he would obtain a replacement to attend the training on Monday, concluding his email by saying he "accept[ed] [Thomas's] resignation." Def. App. 51. Thomas replied that she had not resigned. Def. App. 49. Darrin ignored this representation, emailing Thomas that they needed to train someone who expected to continue their employment with Gray Transportation and that he appreciated the notification of "her intentions and again, [he] accept[ed] [her] resignation." Def. App. 50. LeRoy added that it was "not right to spend the time and money to train" Thomas on the new system and indicated that they had already arranged for a dispatcher candidate to come in for an interview. Def. App. 51. Thomas asked whether they wanted her to come in for work on Monday, since they had no intentions of training her on the new system. Def. App. 54. Darrin emailed that he never said she was terminated, and LeRoy clarified that they would "have other work for [Thomas]," and "[i]f [she didn't] like or accept it [she] can make the decision to stay or leave." Def. App. 53.

Thomas went to talk to LeRoy in person and covertly recorded the conversation. Def. SOF ¶¶ 21-22; Pl. Resp. SOF ¶¶ 21-22; Def. Ex. K (audio recording). The recording captures LeRoy twice telling Thomas rather angrily that he was "not going to invest ten cents in [her]" for training given that she was looking for new employment. *Id*. LeRoy continued that if Thomas were "working for [him]," she would be doing "something else within this company," not dispatching. *Id*. Thomas asked whether she would receive a decrease in pay with a new position, and LeRoy said, "Well, could be, depends on what I'm going to have you do." *Id*. Thomas asked whether she would have a choice in the matter, and LeRoy retorted, "you'll have a choice of quitting." *Id*. Thomas said she liked dispatching, but LeRoy said she would no longer be doing that. *Id*. Thomas asked if he had any idea what her new job would be, and he said no. *Id*. The next day, Thomas emailed LeRoy and Darrin "respectfully declin[ing]" the new

5

position, indicating that she could not take a position with lesser pay. Def. App. 59. Thomas's last day was Friday, January 20, 2017. Pl. App. 59.

During the time that Thomas worked as a dispatcher for Gray Transportation, she made less money than the other dispatchers, none of whom were African-American. Pl. App. 62-63. The dispatchers working for Gray Transportation at the time Thomas was hired made between $43,200 and $48,400 a year. Pl. App. 62-63; Pl. SOF ¶¶ 4-16; Def. Resp. SOF ¶¶ 4-16. The dispatchers hired after Thomas also made more than her. Yasmina Halkic, a white Bosnian woman who was hired after Thomas, made $39,000 a year. *Id.* And Edin Obic, a white Bosnian male who began working as a dispatcher after Thomas but who had previously worked for Gray Transportation as a driver manager, maintained his salary of $63,000 after his change in positions. *Id.*

## II. DISCUSSION

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." For the plaintiff to avoid summary judgment, sufficient evidence must exist "on which the jury could reasonably find for the plaintiff." ***Olmsted v. Saint Paul Pub. Sch.***, 830 F.3d 824, 828 (8th Cir. 2016) (quoting ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 252 (1986)). The court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." ***Soo Line R.R. Co. v. Werner Enters.***, 825 F.3d 413, 418 (8th Cir. 2016) (quoting ***Bishop v. Glazier***, 723 F.3d 957, 960-61 (8th Cir. 2013)).

Gray Transportation moves for summary judgment on Thomas's claims of race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, which prohibits an employer from "discharg[ing] an individual[] or otherwise . . . discriminat[ing] against any individual with respect to [her] compensation, terms,

6

conditions, or privileges of employment, because of such individual's race . . . [or] sex." **42 U.S.C. § 2000e–2(a)(1)**. As I read the complaint and the summary-judgment briefing, Thomas alleges Title VII claims based on her failure to receive a brokerage bonus in June 2016, the termination of her employment in January 2017, and unequal salary (although the pleadings could be clearer). *See* Docs. 2, 19. Gray Transportation's original briefing in support of its motion addresses only the discriminatory-discharge claim (indeed, Gray Transportation does not respond to Thomas's argument that the "adverse employment actions" against her included her failure to receive a bonus and her unequal pay).[4] *See* Doc. 15; Doc. 19 at 9-10; Doc. 21. At the hearing on the summary-judgment motion, both parties seemed to agree on the claims Thomas was bringing and that Gray Transportation was moving for summary judgment on all of those claims. I requested supplemental briefing, expressing particular concern regarding the unequal-pay claims, which the parties provided. Docs. 24, 25.

### *A. Thomas's Title VII Claims Based on Failure to Receive a Bonus and Her Termination*

"[T]o survive a motion for summary judgment on a discrimination claim, a plaintiff must either present admissible evidence directly indicating unlawful discrimination, or create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, [411 U.S. 792] (1973)." **Rooney v. Rock-Tenn Converting Co.**, 878 F.3d 1111, 1115 (8th Cir. 2018)

---

[4] Thomas does not argue that the temporary "firing" on December 23, 2016, amounted to an adverse employment action.

7

(bold emphasis added). Here, Thomas does not contend that direct evidence of discrimination exists, so the burden-shifting framework applies.

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination, which requires the plaintiff prove "(1) [that the plaintiff] is a member of a protected class, (2) [that the plaintiff] met [the] employer's legitimate expectations, (3) [that the plaintiff] suffered an adverse employment action, and (4) [that] the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)).[5] "Once a plaintiff successfully establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 577-78. "If the employer meets its burden, the presumption of discrimination disappears, and [the] plaintiff is required to prove the proffered justification is merely a pretext for discrimination." *Id.* at 578. Gray Transportation argues that Thomas cannot establish an adverse employment action or that she was treated differently than similarly situated employees, as necessary for a prima facie case. Even if Thomas has submitted sufficient evidence of a prima facie case, Gray Transportation argues that it has offered a nondiscriminatory reason for its actions and that Thomas cannot establish pretext.

I assume, without deciding, that Thomas has established a prima facie case of discrimination based on her discharge or demotion in January 2017 and her failure to receive a brokerage bonus in June 2016. Gray Transportation asserts that Thomas was discharged or demoted because she was seeking other employment, and the company did

---

[5] *Young* involved a race discrimination claim under 42 U.S.C. § 1981, which uses the same standard as race and sex discrimination claims under Title VII. *See Faulkner v. Douglas Cnty. Neb.*, 906 F.3d 728, 732 (8th Cir. 2018) (sex discrimination under Title VII); *Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 774 (8th Cir. 2016) (race discrimination under Title VII).

not want to invest money on a week-long training session for Thomas only to have her quit shortly thereafter. This is a legitimate, nondiscriminatory reason for ending Thomas's work as a dispatcher. *See Malik v. Amini's Billiard & Bar Stools, Inc.*, 454 F. Supp. 2d 1106, 1114 (D. Kan. 2006). With regard to Thomas's failure to receive a brokerage bonus, Gray Transportation suggests that Thomas's work as a broker did not generate as much revenue as Saric's work and that the entire brokerage bonus was "probably" awarded to Saric in June 2016 because he performed most of the brokerage work for that month. Awarding a bigger bonus to the employee who generated most of the profit (even though the policy was to split the bonus evenly), rather than giving a bonus to an employee who did not generate much revenue (even if seemingly required by the broad terms of company policy), is a nondiscriminatory business reason for failing to give Thomas a bonus. *Cf. Ferrand v. Credit Lyonnais*, No. 02 Civ.5191(VM), 2003 WL 22251313, at *6 (S.D.N.Y. Sept. 30, 2003) (noting that awarding "a greater proportion of the bonus funds . . . to two key salespersons who had done particularly well" was a "legitimate business reason[]" for awarding the plaintiff a decreased bonus), *aff'd*, 110 F. App'x 160 (2d Cir. 2004) (summary order).

Thus, the burden shifts back to Thomas to "demonstrate a material question of fact" that Gray Transportation's proffered reasons for the adverse employment actions are "pretext for discrimination." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc). "[Thomas's] burden to show pretext 'merges with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination.'" *Id.* at 1046 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). An employee may prove pretext in two ways:

> "First, a plaintiff may succeed 'indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Under this method, the employee must rebut the employer's "underlying factual claims" by establishing that the employer's explanation has no basis in fact.

9

> Second, the plaintiff may prove pretext "'directly by persuading the court that a [prohibited] reason more likely motivated the employer.'" Under this method, the employee rebuts "the employer's ultimate factual claim regarding the absence of [discriminatory] intent." The employee must demonstrate "that sufficient evidence of intentional [discrimination] exists for a jury to believe the plaintiff's allegations and find that the proffered explanation was not the true motivating explanation." Thus, the employee "may concede that the proffered reason for the [adverse action] *would have been* a sufficient basis for the adverse action while arguing that the employer's proffered reason was not the true reason for the action."

*Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006) (first alteration in original) (citations omitted) (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120-21 (8th Cir. 2006)); *see also Torgerson*, 643 F.3d at 1047.

Thomas argues that the following evidence demonstrates pretext: Gray Transportation paid her less than the other dispatchers; Darrin falsely accused her of coming to work hungover on December 23, 2016; Darrin falsely stated she had "resigned" by email in January 2017; and Gray Transportation provided shifting reasons over time regarding why she was not offered a bonus. None of this evidence suggests Gray Transportation's proffered reason for firing Thomas—that it did not want to expend money on new training for Thomas when she was applying for other jobs—is "unworthy of credence." Neither do I find that this evidence is sufficient to support that Thomas's termination or demotion was motivated by her race or sex. Even if Darrin's hangover accusation was false, Thomas's employment continued for a few weeks after that incident. Although the January 2017 emails indeed demonstrate Darrin attempted to force Thomas to resign (to avoid having to discharge or demote her), the emails indicate this action was taken as the result of Thomas applying for other jobs, not her race or sex. Thomas's recorded conversation with LeRoy also supports that Gray Transportation's true reason for firing her was that she applied for other employment. Indeed, Thomas even admitted in response to an interrogatory asking her to describe her "efforts to find alternative or

replacement employment" that she "got fired for putting in other job applications." Def. App. 61. Similarly, and as discussed in the context of Thomas's other claims below, the evidence does not support that Gray Transportation paid Thomas less than other dispatchers based on her race or sex.

For much of the same reasons, the evidence Thomas points to does not establish that her lack of bonus in June 2016 was based on her race or sex. Thomas's argument that Gray Transportation's reasons for her lack of bonus changed over time and thus is unworthy of credence merits further discussion, however. "A change in an employer's legitimate, nondiscriminatory reason" for an adverse employment action may be "probative of pretext," but "only if the discrepancy is 'substantial.'" *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 613 (8th Cir. 2014) (en banc) (quoting *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 957 (8th Cir. 2012)). Thomas testified at her deposition that when she first asked LeRoy why she did not receive a bonus, he said "it was his company and he can do what he wants and if [she didn't] like it, [she] could quit." Pl. App. 47. In response to an inquiry from the Equal Employment Opportunity Commission (EEOC) in May 2017, Darrin stated that Thomas "never received a brokerage bonus because after her training period she did not generate enough revenue to offset a bonus package." Pl. SOF ¶ 37; Def. Resp. SOF ¶ 37; Pl. App. 21-22. In its current briefing, Gray Transportation argues that Thomas did not do enough brokerage work to generate a profit and to warrant a bonus. Thomas argues that this reason differs from the one given to the EEOC, which she characterizes as not being "paid a bonus because she had not completed her training period for brokering activities." Doc. 19 at 9. But the reason given to the EEOC was not that she had not finished a training period; rather, it was that she had not generated enough revenue. This reason is the same as Gray Transportation's current reason. *See also McNeal v. Univ. of Minn. Physicians*, 235 F. Supp. 3d 1077, 1088 (D. Minn. 2017) (holding that employer's failure to provide plaintiff with a reason for his termination originally, despite plaintiff asking

11

for an explanation, was not a "shift" from employer's current explanation—that plaintiff was fired for violating company policies—and did not establish pretext), *aff'd*, 729 F. App'x 486 (8th Cir. 2018) (per curiam). Thomas's evidence is insufficient to establish pretext.

There is insufficient evidence for a jury to find that Gray Transportation's proffered reasons were pretextual. Accordingly, Gray Transportation is entitled to summary judgment on Thomas's claims of race and sex discrimination based on lack of bonus and her discharge or demotion.

### *B. Thomas's Title VII Claims Based on Unequal Pay*

Thomas brings claims of unequal pay based on sex and race under Title VII. Because the standards differ, I will address each claim separately.

#### *1. Unequal Pay Based on Sex*

"Where a claim is for unequal pay for equal work based upon sex, the standards of the Equal Pay Act apply whether the suit alleges a violation of the Equal Pay Act or of Title VII." *McKee v. Bi-State Dev. Agency*, 801 F.2d 1014, 1019 (8th Cir. 1986). "This analytical framework differs from the *McDonnell Douglas* burden shifting analysis." *Taylor v. White*, 321 F.3d 710, 716 (8th Cir. 2003) (italics added). First, a plaintiff must establish a prima facie case by showing that the employer paid "different wages to employees of opposite sexes for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *McKee*, 801 F.2d at 1019 (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). Then, the burden shifts to the defendant to "prove that the pay differential was based on a factor other than sex"; unlike under *McDonnell Douglas*, "a defendant cannot escape liability merely by articulating a legitimate non-discriminatory reason for the employment action." *Taylor*, 321 F.3d at 716. The

defendant may meet its burden by demonstrating that the difference in pay was based on "(1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality; or (4) a factor other than sex." *Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1081 (8th Cir. 1999).

Thomas points to Obic as a comparator, a white Bosnian man who began working as a dispatcher after her but who was paid more than double Thomas's salary (Obic earned $10,000 more annually than every dispatcher working for Gray Transportation at the time). Doc. 25 at 5. Whether Thomas has established that Obic performed equal work is a close issue. Thomas primarily seems to rely on evidence that both were dispatchers, but "neither job classifications nor titles are dispositive for determining whether jobs are equal." *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 (8th Cir. 2003) (quoting *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1029 (8th Cir. 2002)). Rather, "the actual requirements and performance of the job"—including "the level of experience, training, education, ability, effort, and responsibility" it requires—are determinative. *Horn v. Univ. of Minn.*, 362 F.3d 1042, 1045 (8th Cir. 2004) (quoting *Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 492 (8th Cir. 2003)). "Jobs do not have to be identical[;] . . . . . '[i]nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable.'" *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 961 (8th Cir. 1995) (quoting 29 C.F.R. § 1620.14(a)). Both Thomas and Obic managed drivers, although Obic managed local drivers who slept in their own bed every night, while Thomas managed drivers who traveled longer distances—indeed, this is the only difference between the two positions that Darrin pointed to in his deposition. Def. Second Supp. App. 84. Additionally, Gray Transportation argues that Obic's position is distinguishable because he was handling a large account and had to travel to distribution centers as a customer representative. Def. Second Supp. App. 75, 84, 91. Thomas has not offered much evidence regarding her duties and responsibilities, although she did

testify in her deposition that she trained Obic once he became a dispatcher. Def. App. 40; Pl. App. 50.

Even if Thomas has offered sufficient evidence to establish that she and Obic performed equal work, the evidence is uncontroverted that prior to becoming a dispatcher, Obic worked for Gray Transportation as a driver manager. Pl. App. 50; Def. Supp. App. 74-76; Def. Second Supp. App. 93. In this position, he did many of the same duties as a dispatcher, except that he also drove a truck (and did not work from an office). Def. Supp. App. 74. As a driver manager, he worked on a big account responsible for 25% of Gray Transportation's truck driving business. Def. Second Supp. App. 82-84. When Gray Transportation lost that account, Obic became a dispatcher working out of the office, but he kept the salary he had had as a driver manager. Def. Supp. App. 75. Obic's prior work (and salary) for Gray Transportation establish that his higher salary was based on a factor other than sex. *Cf. Taylor*, 321 F.3d at 720-21 (affirming grant of summary judgment to defendant on plaintiff's Title VII claim alleging unequal pay based on sex when the evidence established the male comparators were higher paid due to a salary retention policy in which higher-paid employees performed lower-paid work at their same salary when their higher-paid work was unavailable). That Obic's salary was the result of his prior position as a driver manager is further evidenced by the fact that Obic made $10,000 more annually than any other dispatcher, male or female. Because the evidence establishes, as a matter of law, that Obic's higher salary was the result of a factor other than sex, Gray Transportation is entitled to summary judgment on Thomas's Title VII claim alleging unequal pay based on sex.

### *2. Unequal Pay Based on Race*

The *McDonnell Douglas* burden-shifting framework applies to a Title VII claim alleging unequal pay based on race. *See **Stone v. McGraw Hill Fin., Inc.***, 856 F.3d 1168, 1174 (8th Cir. 2017). The Eighth Circuit has held that the standard for a plaintiff

to establish a *prima facie* case is the same as in the Equal Pay Act context: "to establish a prima facie case of salary discrimination under Title VII, [a plaintiff] must show that [the employer] paid different wages to employees of different races for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" **Tademe v. Saint Cloud State Univ.**, 328 F.3d 982, 989 (8th Cir. 2003) (quoting **Sowell v. Alumina Ceramics, Inc.**, 251 F.3d 678, 682 (8th Cir. 2001)); *accord* **Fair v. Norris**, 480 F.3d 865, 870 (8th Cir. 2007). The Eighth Circuit has also phrased the test using the familiar *McDonnell Douglas* language for a prima facie case, which includes "that similarly situated employees outside the protected class were treated differently." *See* **Smith v. URS Corp.**, 803 F.3d 964, 968-69, 969 n.3 (8th Cir. 2015).

Thomas has established a prima facie case of salary discrimination based on race. Thomas's salary was lower than every other dispatcher's salary, none of whom were African-American.[6] Halkic, a white Bosnian woman hired as a dispatcher after Thomas, made $39,000 a year, while Thomas made $31,200 (both women started at those salaries). Thomas trained Halkic. Halkic was responsible for dispatching five to seven trucks, while Thomas was responsible for dispatching "[d]ouble, almost triple that." Pl. App. 54. Darrin testified that Halkic's and Thomas's positions were the same. Pl. App. 27-28. This evidence is sufficient to establish that Halkic and Thomas performed equal work or were similarly situated for purposes of Thomas's prima facie case.

Gray Transportation argues that it has legitimate, nondiscriminatory reasons for the pay differential between Thomas and Halkic. When Thomas submitted her application to work for Gray Transportation, she did not request a specific pay rate. Def.

---

[6] Thomas does not argue, however, that any dispatchers other than Obic and Halkic performed equal work or were otherwise similarly situated to her (most of the dispatchers had seniority over Thomas). *See* Doc. 25.

Supp. App. 81. Gray Transportation offered Thomas a 50¢ per hour raise as compared to what she had been making, and she accepted the offer without requesting additional pay. Def. SOF ¶ 5; Pl. Resp. SOF ¶ 5; Pl. SOF ¶¶ 4, 17; Def. Resp. SOF ¶¶ 4, 17; Pl. App. 29, 31; Def. App. 17. Halkic, on the other hand, requested a specific salary in her application. Def. Supp. App. 81. Darrin testified that they "tried to get [Halkic] for a lower rate" but "were unable to" and that they "understood through the interview process that [Halkic] was a single parent, raising a couple [of] kids, and that she wouldn't accept [Gray Transportation's] offer," so they "had to raise [the] offer up in order to be able to get her." Def. Supp. App. 81. Gray Transportation also asserts that it was eager to hire Halkic due to her connections to the Bosnian community and ability to speak Bosnian, which Gray Transportation hoped to use to recruit drivers. Docs. 21, 24; Pl. App. 28. That Halkic negotiated for a higher salary, unlike Thomas, is a legitimate, nondiscriminatory reason for the pay disparity between Halkic and Thomas. *See Augustus v. MSG Metro Channel*, 217 F. Supp. 2d 458, 462-63 (S.D.N.Y. 2002). Gray Transportation could also appropriately consider that Halkic spoke Bosnian, unlike Thomas, who did not speak another language. *See Cooper v. Conn. Pub. Def.'s Office*, 480 F. Supp. 2d 536, 546-47 (D. Conn. 2007), *aff'd*, 280 F. App'x 24 (2d Cir. 2008) (summary order). I also find that Halkic's connections to the Bosnian community is a nondiscriminatory reason, as it is not necessarily dependent on the fact that she is Bosnian—as just two examples, a non-Bosnian could have connections to the Bosnian community due to friendship with Bosnian people or living in Bosnia for a period of time.

The burden thus shifts to Thomas to demonstrate that Gray Transportation's proffered reasons are a pretext for race discrimination. Thomas fails to do so. Thomas offers no evidence or even argument on this issue. *See* Docs. 19, 25. Accordingly, I find that Gray Transportation is entitled to summary judgment as a matter of law.

### *III. CONCLUSION*

Gray Transportation's motion for summary judgment (Doc. 15) is **granted**. Judgment should be entered in favor of Gray Transportation.

**IT IS SO ORDERED** this 12th day of December, 2018.

*[signature]*

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa